63 F.3d 1501
 95 Cal. Daily Op. Serv. 6601, 95 Daily Journal
D.A.R. 11,313
Harpinder SINGH, Petitioner-Appellant-Cross-Appellee,
v.
David ILCHERT, District Director, INS,
Respondent-Appellee-Cross-Appellant.
 Nos. 94-15110, 94-15111.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 9, 1995.
Decided Aug. 22, 1995.
 
 Ellen Sue Shapiro, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, and John B. Bartos, Asst. U.S. Atty., Los Angeles, CA, for respondent-appellee-cross-appellant.
 Robert B. Jobe, Jobe & Belrod, San Francisco, CA, for petitioner-appellant-cross-appellee.
 Appeals from the United States District Court for the Northern District of California.
 Before: GOODWIN and SCHROEDER, Circuit Judges, and TASHIMA*, District Judge.
 OPINION
 SCHROEDER, Circuit Judge:
 
 
 1
 Petitioner-appellee Harpinder Singh is a Sikh who attempted to enter this country illegally from India. He filed a habeas corpus petition in district court after the Board of Immigration Appeals ("BIA") deemed him excludable and denied his applications for asylum pursuant to 8 U.S.C. Secs. 1101(a) & 1158(a) and withholding of deportation pursuant to 8 U.S.C. Sec. 1253(h). The district court held that Singh had established that he had suffered past persecution on account of political opinion within the meaning of the applicable statutes and Ninth Circuit case law and remanded to the BIA for further proceedings.
 
 
 2
 Two principal questions are presented in the government's appeal. The first is whether the district court erred when it rejected the BIA's position that a person who suffered torture at the hands of police, as a result of his suspected association with separatist Sikh militants, had not suffered persecution on account of political opinion within the meaning of 8 U.S.C. Sec. 1101(a)(42)(A). The second is whether the BIA violated applicable law when it required the applicant to establish a fear of country-wide persecution. The second issue has recently been decided adversely to the government in Singh v. Moschorak, 53 F.3d 1031, 1034 (9th Cir.1995). We have jurisdiction under 28 U.S.C. Sec. 2253 and affirm the district court's holding that under the correct legal standards, Singh showed a well-founded fear of persecution on account of political opinion and thus is eligible for asylum consideration by the BIA. We further hold that Singh has established a "clear probability" of future persecution and has thus met the stricter standard for mandatory withholding of deportation.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 The facts of Singh's case are drawn from the district court's statement of facts in its order granting Singh's petition for habeas corpus, which in turn is based on Singh's testimony before the Immigration Judge ("IJ"). The IJ expressly found the material elements of that testimony credible.
 
 
 4
 Petitioner Harpinder Singh is a 24-year-old native and citizen of India, who fled that country and attempted to enter the United States at Los Angeles International Airport without proper documentation in September, 1991. Singh was born in Malpur, in the District of Hashpur, in the State of Punjab. Before leaving India, he lived in the State of Punjab and worked with his family farming their land. Singh is a member of the Sikh religion. Although he is not a member of any political party, he supports the movement for formation of an independent Sikh state, Khalistan, through peaceful means.
 
 
 5
 On April 23, 1991, seven armed members of a militant Sikh separatist organization, the Bhindrawal Tiger Force, visited Singh's home in the middle of the night and demanded food and shelter. The militants spent the night at Singh's home and asked Singh to join their organization. Although he disapproved of the militants' violent methods and had no intention of joining in them, Singh responded that he would "think it over." After this encounter, the militants visited Singh's home on six other occasions. Each time they stayed for a short while, ate, and pressured Singh to join their group.
 
 
 6
 In the early morning hours of May 10, 1991, the police raided Singh's home while his family slept. The police searched the home and arrested Singh without a warrant. They beat him with their fists and wooden rods and then transported him to the village police station.
 
 
 7
 The police detained Singh without charge for ten days. The first five days he was beaten periodically with a baton and a wide leather belt while suspended upside down with his legs stretched far apart. During the course of this abuse Singh lost consciousness several times. He testified that as a result of the beatings he has suffered lasting damage to his legs and has difficulty standing up because of the pain.
 
 
 8
 During the beatings the police interrogated Singh about the Sikh militants. The police asked him for information regarding when the militants visited him, what they did, and where they went upon their departure. Singh testified that because of his fear of retribution from the militants he refused to give any information to the police. Singh was released after ten days when his family paid a 20,000 rupee bribe to the police inspector. Singh returned home upon his release.
 
 
 9
 On July 13, 1991, four Sikh militants came to Singh's home while he was working in the fields. They demanded that he join them, and when he refused, they beat him. Immediately afterwards, the militants blindfolded Singh, kidnapped him, took him to an unknown location, and held him captive for ten days. During his captivity the militants beat him and insisted that he join their ranks. The militants also sent a ransom note to his family demanding money in exchange for Singh's release. He eventually was released after his family paid a 100,000 rupee ransom. However, when the militants released Singh they instructed him to relay information to them about the police or police informants. Because Singh feared that the militants would kill him if he refused, he agreed to do so.
 
 
 10
 On August 3, 1991 the Indian police again went to Singh's home early in the morning. The police arrested him and his father without a warrant and transported them to the village police station. Singh's father was beaten by the police and released the next day, but Singh was held for eight days. Neither Singh nor his father was ever formally charged or brought before a magistrate or a judge.
 
 
 11
 Periodically during his detention, Singh was beaten with bamboo sticks by the police while suspended upside down. The police also interrogated him about his stay with the militants. Singh did not disclose any information to the police about the militants, however, because he feared that the militants would kill his family. Singh was released after paying a bribe to a police inspector. Again, Singh returned home.
 
 
 12
 Three days after his release Singh was visited by the militants who had kidnapped him. Singh testified that the militants had intended to induct him into their organization, but, upon discovering the extent of the injuries he suffered in police custody, they departed without him. Singh later fled his home and went to stay with an aunt who lived about fifty kilometers away from his village. He testified that he stayed there for only fifteen days because he felt unsafe and afraid.
 
 
 13
 After his stay with his aunt, Singh moved to New Delhi, where he stayed for about twenty-five days with a friend. During this period he continued to feel insecure and did not leave the house except to attend the Sikh temple, and even then felt afraid. He testified that he was afraid the police would locate him in New Delhi. Singh also testified that he felt he could not move to another region in India because he did not speak Hindi, the national language or other regional dialect, and would easily be identified as a Sikh.
 
 
 14
 Singh returned to his home in the Punjab for one month, because his father had made arrangements for Singh to flee the country. Singh departed from New Delhi and arrived at Los Angeles International Airport on September 29, 1991 without proper documentation. He was immediately arrested by the INS and charged with being excludable pursuant to the 8 U.S.C. Sec. 1182(a)(6)(C)(i), Immigration and Nationality Act Sec. 212(a)(6)(C)(i) (attempted entry with fraudulent documents), and 8 U.S.C. Sec. 1182(a)(7)(A)(i)(I), INA Sec. 212(a)(7)(A)(i)(I) (attempted entry without a valid document).
 
 
 15
 In a hearing before the IJ on February 14, 1992, Singh conceded excludability and requested asylum and withholding of deportation to India. The IJ denied Singh's application for both forms of relief. Finding "the heart of Singh's testimony" credible, the IJ took judicial notice of the fact that due to the conflict and violence between Sikhs attempting to create an independent state and the Indian security forces there have been a number of documented instances of human rights abuses. Nevertheless, the IJ found that Singh had failed to establish either "past persecution" or "a reasonable fear of future persecution at the hands of the Indian security forces" based on any of the five factors enumerated in the asylum statute. Specifically, the IJ held that neither the coercion by the militants to secure Singh's cooperation nor the mistreatment suffered at the hands of the police constituted past persecution on account of political belief. The IJ added in closing:
 
 
 16
 Because the decision to grant or deny asylum is discretionary in nature, the Court will state for the record, in the event of an appeal, that if the Court had found that the applicant met the statutory criteria for asylum the Court would have found that asylum was merited as a matter of discretion.
 
 
 17
 Singh appealed the IJ's decision to the BIA. In February of 1993, the BIA dismissed Singh's appeal in a short opinion in which it agreed with the IJ that Singh had not demonstrated past persecution or a well-founded fear of persecution on account of political belief. Specifically, the BIA found:
 
 
 18
 there is no persuasive evidence that the mistreatment suffered by the applicant at the hands of the Indian police was on account of his political opinion or the mere fact that he was a "Sikh". He did not show that the police action extended beyond an investigation of and reaction against those thought, rightly or wrongly, to be militants seeking the violent overthrow of the government.
 
 
 19
 The BIA did not disturb the IJ's favorable credibility finding. Additionally, the BIA held that even if Singh had established past persecution it would deny him asylum under its discretionary power "in view of the absence of a threat of persecution throughout India and the factual circumstances of his case."
 
 
 20
 Having exhausted his administrative remedies, Singh petitioned for writ of habeas corpus, and the district court issued an order granting the petition. The district court reviewed de novo the BIA's treatment of the issues involved and, following the court's earlier opinion in a Sikh deportation case, Singh v. Ilchert, 801 F.Supp. 313 (N.D.Cal.1992), found that the BIA erred as a matter of law in holding that Singh had not established persecution on account of political opinion. The district court concluded that Singh had established statutory eligibility for asylum.
 
 
 21
 The district court further found that the BIA abused its discretion in improperly allocating the burden of proof of establishing a likelihood of future persecution in other parts of India to Singh. The court remanded Singh's case to the BIA with instructions to hear additional evidence regarding the situation in other parts of India.
 
 
 22
 II. LEGAL STANDARDS FOR ASYLUM AND WITHHOLDING OF
 
 DEPORTATION
 
 23
 To establish eligibility for asylum, an alien must show that he or she is a "refugee" within the meaning of Sec. 101(a)(42)(A) of the INA, 8 U.S.C. Sec. 1101(a)(42)(A), i.e., that he or she has experienced either past persecution or has a "well-founded fear of persecution" on account of the alien's race, religion, nationality, membership in a particular social group, or political opinion. Eligibility for asylum may be based on past persecution alone. Acewicz v. INS, 984 F.2d 1056, 1062 (9th Cir.1993). The test for "well-founded fear" includes both subjective and objective components. The former is satisfied if the fear is genuine. Bolanos-Hernandez v. INS, 767 F.2d 1277, 1283 n. 11 (9th Cir.1984). The subjective component may be satisfied by an applicant's credible testimony that he genuinely fears persecution. Acewicz, 984 F.2d at 1061. The objective component requires a showing "by credible, direct, and specific evidence in the record," Diaz-Escobar v. INS, 782 F.2d 1488, 1492 (9th Cir.1986), that persecution is a reasonable possibility. See INS v. Cardoza-Fonseca, 480 U.S. 421, 440, 107 S.Ct. 1207, 1217-18, 94 L.Ed.2d 434 (1987) (ten percent possibility sufficient). The objective component may be satisfied "by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." Desir v. Ilchert, 840 F.2d 723, 726 (9th Cir.1988). If an alien is found to be a refugee, the Attorney General has discretion to grant the alien asylum relief. Id. at 428 n. 5; 8 U.S.C. Sec. 1158(a).
 
 
 24
 Under Sec. 243(h) of the INA, the Attorney General must withhold deportation of any alien to a country if the Attorney General determines that such alien's life or freedom "would be threatened in such country" on account of one of the enumerated factors. See 8 U.S.C. Sec. 1253(h); Arteaga v. INS, 836 F.2d 1227, 1228-29 (9th Cir.1988). A "clear probability of persecution," id., or a "more likely than not" standard, INS v. Stevic, 467 U.S. 407, 424, 104 S.Ct. 2489, 2497-98, 81 L.Ed.2d 321 (1984), is applicable to a withholding of deportation claim. This standard of proof is more stringent than the "well-founded fear of persecution" standard for asylum eligibility. Cardoza-Fonseca, 480 U.S. at 427-32, 107 S.Ct. at 1211-13.
 
 III. STANDARD OF REVIEW
 
 25
 This court reviews de novo the decision whether to grant or deny a petition for habeas corpus. Desir, 840 F.2d at 726. The issues before this court are thus in the same posture as those before the district court and require us to consider the rulings of the BIA.
 
 
 26
 We have long employed different standards of review for the BIA's factual findings and its interpretations of law. We review the BIA's factual findings under the deferential "substantial evidence" standard. 8 U.S.C. Sec. 1105a(a)(4);[1] INS v. Elias-Zacarias, 502 U.S. 478, 480-81, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); Abedini v. INS, 971 F.2d 188, 191 (9th Cir.1992). This court reviews questions of law regarding the INA under the less deferential de novo standard. Maldonado-Cruz v. Dept. of Immigration and Naturalization, 883 F.2d 788 (9th Cir.1989); Lazo-Majano v. INS, 813 F.2d 1432, 1434 (9th Cir.1987).
 
 
 27
 The facts are not at issue in this case. The IJ expressly credited "the heart of the applicant's testimony ... that he was on a number of occasions arrested, detained, interrogated, and severely physically abused by Indian security forces." The BIA left the IJ's credibility determination undisturbed; therefore, we must accept as undisputed the facts as testified to by petitioner.
 
 
 28
 Because the issues presented in this appeal involve the application of established legal principles to undisputed facts, our review of the BIA's asylum and withholding of deportation determinations is de novo. As this court held in Maldonado-Cruz, when "the issue does not involve questions of proof, but whether the harm the respondent fears is on account of 'political opinion'.... [r]esolution of [the] matter involves a question of law, [and] we review the decision of the BIA de novo." See also Desir, 840 F.2d at 726 ("questions concerning the requirements of the applicable statutes ... are questions of law" which we review de novo); Lazo-Majano v. INS, 813 F.2d 1432, 1434 (9th Cir.1987) (whether petitioner's credible testimony met applicable legal requirements involved legal questions subject to de novo review); Tarvand v. INS, 937 F.2d 973, 975 (4th Cir.1991) (mixed questions of law and fact in deportation proceedings reviewed de novo).
 
 
 29
 The government dedicates the bulk of its argument on appeal to challenging the district court's exercise of de novo review in its grant of petitioner's habeas corpus petition. The government argues that under the Supreme Court's holding in INS v. Elias-Zacarias, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), the BIA's asylum eligibility and withholding determinations can only be reviewed under the "substantial evidence" standard. The Supreme Court in Elias-Zacarias, however, dealt with a number of issues. It first held, as a matter of law, that recruitment of an individual by a guerrilla organization is not, in and of itself, persecution "on account of political opinion." Id. at 480-82, 112 S.Ct. at 815-16. It then held that the applicant would have to establish a well-founded fear that the guerrillas would persecute him "because of political opinion" rather than because he refused to join the guerrillas. Id. at 482, 112 S.Ct. at 816. This also was a burden imposed as a matter of law. Finally, the Supreme Court held that whether the applicant in a particular case had sustained its burden by sufficient evidence involves issues of fact. The Court said that the applicant in that case could obtain judicial reversal of a BIA adverse asylum eligibility determination only by showing that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 484, 112 S.Ct. at 817.
 
 
 30
 The government relies upon this language in arguing that a substantial evidence standard applies to our review here. Yet this language does not mean that every review of an asylum eligibility determination involves only questions of fact, nor does it alter our application of de novo review to questions of law. Abedini, 971 F.2d at 190 (de novo standard applies to BIA's "determination of purely legal questions," "substantial evidence" standard used for review of factual findings). See also Kotasz v. INS, 31 F.3d 847, 851 (9th Cir.1994) (Elias-Zacarias does not "preclude a court from vacating the BIA's asylum determination and remanding a case for further consideration where the BIA's denial was based upon an error of law"); See Ghebllawi v. INS, 28 F.3d 83, 86 (9th Cir.1994) (declining to find that "without saying so the Supreme Court intended to change the normal principles of administrative review").
 
 
 31
 In rejecting Singh's application, the BIA relied exclusively on its prior decision in Matter of R, Int. Dec. 3195 (BIA 1992), finding that the facts in the two cases were materially indistinguishable. That the real battle in this case is over issues of law, not fact, is made clear by examining the BIA's opinions in Matter of R.[2] In that case, a Sikh in the Punjab was brutalized by Indian police forces in the course of an investigation of his suspected militant affiliations. The BIA members divided on each of the two legal issues presented.
 
 
 32
 The first was whether there had been persecution "on account of political opinion." The majority held that such persecution had not been established because the purpose of the police brutality was to obtain information about militants. Id. at 6. The dissent asserted that such a conclusion violated the controlling authority in this circuit that violence against persons suspected of supporting an anti-government faction is "persecution on account of political opinion" within the meaning of the statute. Id. at 12 (Dunne, M.M., concurring in part and dissenting in part) (citing Blanco-Lopez v. INS, 858 F.2d 531, 534 (9th Cir.1988)). Still a third BIA member, in a special concurrence, took the view that, as a matter of law, police actions toward those suspected of criminal activity is never "persecution on account of political opinion." Id. at 23 (Heilman, M.J., concurring).
 
 
 33
 The second issue concerned the extent to which the applicant had to show a threat of persecution country-wide. The majority held that he had a burden to show country-wide persecution. Id. at 7-10. The dissent took the view that such a standard was both contrary to that employed in prior BIA decisions and analytically flawed because it failed to follow applicable INS regulations. Id. at 13-16.
 
 
 34
 The issues in this case are the same as those in Matter of R, and the BIA's opinion in this case relied exclusively on Matter of R for its legal authority. Because the issues in both cases involve interpretation of the applicable statutes and regulations, they are issues of law and the district court correctly reviewed them de novo. We now turn to the merits of the appeal.
 
 
 35
 IV. PERSECUTION ON ACCOUNT OF POLITICAL OPINION
 
 
 36
 In denying petitioner's claim of persecution by the Indian police on account of political opinion, the BIA held, following Matter of R, that because the police were after information about Singh's associations with Sikh militants,
 
 
 37
 there is no persuasive authority that the mistreatment suffered by the applicant at the hands of the Indian police was on account of his political opinion or the mere fact that he was a Sikh. He did not show that the police action extended beyond an investigation of and reaction against those thought, rightly or wrongly, to be militants seeking the violent overthrow of the government. [citations to Matter of R omitted].
 
 
 38
 The BIA failed to discuss, let alone attempt to distinguish, contrary Ninth Circuit authority holding that extra-judicial punishment of suspected anti-government guerrillas can constitute persecution on account of imputed political opinion. A federal agency is obligated to follow circuit precedent in cases originating within that circuit. NLRB v. Ashkenazy Prop. Management Corp., 817 F.2d 74, 75 (9th Cir.1987), cert. denied, 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 996.
 
 
 39
 The leading Ninth Circuit authority in this area is Blanco-Lopez v. INS, 858 F.2d 531 (9th Cir.1988). In that case the applicant, a Salvadoran, had been falsely accused of being affiliated with guerrillas. During the three days he was held captive by Salvadoran police, the authorities threatened to kill him if he did not admit to being a guerrilla. Id. at 533. As in the instant case, the BIA affirmed the denial of asylum and withholding of deportation as a matter of law. This court reversed, holding that the petitioner had established past persecution as well as a clear probability of future persecution on account of his political opinion because the government "security forces believed him to be a guerrilla and attempted to persecute him for it." Id. at 534 (granting mandatory withholding of deportation). Similarly, in Maldonado-Cruz v. Dept. of Immigration and Naturalization, 883 F.2d 788 (9th Cir.1989), this court held that an applicant's fear of persecution is on account of political opinion where the petitioner "fears harm from the ... authorities because of his supposed association with the guerillas." Id. at 792. The instant case is materially indistinguishable from Maldonado-Cruz.
 
 
 40
 Both Blanco-Lopez and Maldonado-Cruz distinguished between legitimate criminal prosecution and "governmental persecution based on [petitioner's] perceived political beliefs." Blanco-Lopez, 858 F.2d at 534, quoted in Maldonado-Cruz, 883 F.2d at 792. The BIA's opinion in this case held that the security forces' activities were part of a legitimate inquiry into terrorist activities and thus, by the BIA's reasoning, not politically motivated within the meaning of the immigration laws. The record in this case, however, chronicles without contradiction the Indian authorities' extensive abuse of vague anti-terrorism laws to suppress political dissent and stamp out secessionist ideologies in India. Documents introduced by the applicant included the State Department's 1990 Country Reports On Human Rights Practices and reports from Amnesty International, which the IJ found "entitled to substantial weight." A review of these documents reveals that India defines "terrorism" so broadly, and treats those accused or suspected of terrorism so harshly, that police "investigations" of many suspected terrorists are not legitimate government functions but rather part of a pattern of political suppression.[3]
 
 
 41
 In this case, Singh was not the target of any legitimate government prosecution. As in Blanco-Lopez, "[w]e find no evidence in the record ... that an actual, legitimate, criminal prosecution was initiated against [the applicant.]" Blanco-Lopez, 858 F.2d at 534. If "there is no evidence of a legitimate prosecutorial purpose for a government's harassment of a person ... there arises a presumption that the motive for harassment is political." Hernandez-Ortiz v. INS, 777 F.2d 509, 516 (9th Cir.1985) ("When a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for governmental action, the most reasonable presumption is that the government's actions are politically motivated.").
 
 
 42
 The government maintains that because Singh was not in fact a militant Sikh, and was only suspected of being one, the torture he endured could not have been "on account of political opinion" as that term was used in Elias-Zacarias. The government thus contends that "the vitality of these cases, [i.e., Blanco-Lopez and Ramirez Rivas, 899 F.2d 864 (9th Cir.1990), vacated on other grounds, 502 U.S. 1025, 112 S.Ct. 858, 116 L.Ed.2d 766 (1992) ] has been overtaken by the Supreme Court's decision ... in Elias-Zacarias." This position cannot be sustained, for we have held that "[i]mputed political opinion is still a valid basis for relief after Elias-Zacarias." Canas-Segovia v. INS, 970 F.2d 599, 601 (9th Cir.1992). The very language of the BIA's opinion--petitioner "did not show that the police action extended beyond an investigation of and reaction against those thought, rightly or wrongly, to be militants seeking the violent overthrow of the government"--concedes that petitioner was "thought" by the police to be associated with Sikhs seeking a violent overthrow of the government. The BIA's own language describes a classic example of imputed political opinion. See Desir, 840 F.2d at 729 ("[W]hether the political opinion is actually held or implied makes little difference where the alien's life is equally at risk."); see also United Nations High Commissioner for Refugees, Handbook on Criteria and Procedures for Determining Refugee Status ("UN Handbook") pp 80-83 (a government's persecution of persons to whom it attributes certain political opinions is persecution on account of political opinion).
 
 
 43
 Finally, the BIA failed to recognize that persecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied. The BIA itself has recognized this principle in Matter of Fuentes, 19 I & N Dec. 658, 662 (BIA 1988). The problem was well articulated by the dissenting board member in Matter of R, Int. Dec. 3195 (BIA 1992), who criticized the majority decision in that case:
 
 
 44
 The majority ... implicitly suggest[s] that an alien must prove a persecutorial motivation anchored upon one of the enumerated grounds to the exclusion of all other possible motivations. Matter of Fuentes, however, recognized that there can be more than one possible basis for a persecutor's actions. The task of the alien is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds.
 
 
 45
 Id. at 12-13 (Dunne, M.M., dissenting in part). See also Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir.1994) ("The plain meaning of the phrase 'persecution on account of the victim's political opinion' does not mean persecution solely on account of the victim's political opinion.").
 
 V. COUNTRY-WIDE PERSECUTION
 
 46
 As an alternate ground for holding Singh ineligible for either asylum or withholding of deportation, the BIA held that Singh had a burden to demonstrate country-wide persecution and that he had failed to carry it. The BIA also concluded that even if Singh had established eligibility for asylum it would deny that relief as a matter of discretion "in view of the absence of a threat of persecution throughout India and the factual circumstances of his case." The BIA erred in requiring Singh to show a threat of country-wide persecution for withholding of deportation and for both the eligibility and discretionary stages of its asylum analysis.
 
 
 47
 We recently reached this same conclusion in Singh v. Moschorak, 53 F.3d 1031 (9th Cir.1995). We there considered a district court view that the petitioner "would not qualify for asylum if his persecution by India for political opinion was confined to the Punjab" and concluded that "[s]uch is not the law." Id. at 1034. The BIA's decision in this case is thus contrary to controlling, intervening Ninth Circuit law.
 
 
 48
 The BIA's decision is also contrary to INS regulations that provide that once an applicant has demonstrated that he suffered past persecution, there is a presumption that he faces a similar threat on return. For purposes of asylum eligibility the regulations provide that if the applicant suffered past persecution before leaving the country, the applicant is presumed
 
 
 49
 also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.
 
 
 50
 8 C.F.R. Sec. 208.13(b)(1)(i). For purposes of withholding of deportation, the presumption is similar. Once the applicant establishes initially that "his life or freedom was threatened in the proposed country of deportation," then:
 
 
 51
 it shall be presumed that his life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.
 
 
 52
 8 C.F.R. Sec. 208.16(b)(2). Under the regulations, once the applicant has established that he experienced persecution in the past, the only relevant question is whether conditions in the country have so changed that the threat no longer exists upon his return. There is no burden on the applicant to show that his past experience reflected conditions nationwide.
 
 
 53
 The government argues that the BIA's position amounts to an interpretation of the regulations that should be accorded deference under the principles announced in Chevron USA v. Natural Resources Defense Council, 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). The BIA's analysis did not rest upon an interpretation of ambiguous regulations, however. The regulations' unambiguous provisions permit of no conflicting interpretations.
 
 
 54
 Our conclusion is also fully consistent with Congress' intent in passing the Refugee Act of 1980 that established the statutory requirements for withholding of deportation and asylum. Those provisions were enacted "with the intent of bringing the United States statutory provisions concerning refugees into conformity with the provisions of the United Nations Convention Relating to the Status of Refugees." Damaize-Job v. INS, 787 F.2d 1332, 1336 n. 5 (9th Cir.1986) (citing S.Rep. No. 256, 96 Cong., 2nd Sess. 4, & HR Conf.Rep. No. 781, 96 Cong., 2nd Sess. 19, 20). In light of this legislative intent, the UN Handbook's definition of what factors are relevant to determining refugee status have been deemed by this court to be "particularly significant in analyzing Sec. 243(h) [8 U.S.C. Sec. 1153] and 208(a) [8 U.S.C. Sec. 1253] claims." Id. Paragraph 91 of the UN Handbook directly addresses the "relocation" issue and makes clear that a country-wide threat of persecution is not a necessary prerequisite to a successful asylum claim:
 
 
 55
 The fear of being persecuted need not always extend to the whole territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so.
 
 
 56
 UN Handbook, p 91 (1979).
 
 
 57
 This court's early decisions holding that the BIA may consider evidence of an applicant's ability to relocate to another part of the applicant's country of nationality are distinguishable. None involved a person who had established past persecution; nor did any consider the issue after the July 27, 1990 regulations became effective. See Cuadras v. INS, 910 F.2d 567, 571 n. 2 (9th Cir.1990) (noting that the court may "consider evidence that [petitioner] could avoid the geographical source of his danger when it reviews the BIA's determinations as to 'well-founded fear' of persecution"); Quintanilla-Ticas v. INS, 783 F.2d 955 (9th Cir.1986); Diaz-Escobar v. INS, 782 F.2d 1488, 1493 (9th Cir.1986).
 
 
 58
 Although the existence of a country-wide threat of persecution is not relevant to determining either asylum eligibility, under 8 C.F.R. Sec. 208.13(b)(1), or withholding of deportation eligibility, under 8 C.F.R. Sec. 208.16(b)(2), the reasonableness of an applicant's ability to relocate in his or her home country may be considered in the Attorney General's exercise of discretion in granting or denying asylum as a form of relief. However, the issue must be considered within the constraints of our law. The BIA ignored one such constraint by improperly requiring the petitioner to show the existence of a country-wide threat of persecution by a national police force.
 
 
 59
 This court presumes that in a case of persecution by a governmental body such as a national police force, the government has the ability to persecute the applicant throughout the country. See Damaize-Job v. INS, 787 F.2d 1332, 1336 (9th Cir.1986) (government persecution not limited to one geographical area); Singh, 801 F.Supp. at 321 (noting that "a police force controlled by the national government ... would presumably be capable of locating petitioner in other regions of India" and that "petitioner's ability to avoid further persecution by relocating inconspicuously may be limited by his manner of religious dress and his inability to speak the languages or dialects of other regions of India") (citing Damaize-Job ); cf. Beltran-Zavala v. INS, 912 F.2d 1027, 1030 (9th Cir.1990) (relocation not an option where persecutor is a death squad with "the power to enforce its will").
 
 
 60
 Our laws' wisdom in this area is highlighted by the record in this case. Singh testified credibly and without contradiction that the police could find him in any part of India to which he returned. The record documents the existence of a centralized police force, capable of coordinating its efforts nationally:
 
 
 61
 The Union Ministry for Home Affairs controls the nationwide Indian Police Force, the paramilitary forces, and the intelligence bureaus. Over the last four decades since India's independence, control of law and order operations has moved increasingly under the Home Ministry. This tendency stems in part from the rapid growth of the intelligence bureaus, which function with little reference to the state governments, and in part from the increased use of paramilitary forces against armed insurrectionists in disturbed areas.
 
 
 62
 DOS Report, ER 327.
 
 
 63
 The same report notes that although the TADA was enacted to fight terrorism in Punjab, it is applicable to all of the states except Jammu and Kashmir, which are covered under a different law. Id. at 332. The TADA has been used in a number of different provinces. Id.
 
 
 64
 The only documentation cited by the BIA was an excerpt from the advisory opinion submitted by the DOS Bureau of Human Rights and Humanitarian Affairs ("BHRHA") stating that many Sikhs who live outside the Punjab do not suffer governmental persecution:
 
 
 65
 The advisory opinion ... notes that the Government of India "does not take action against individuals solely as a result of their being members of the Sikh faith" and that large numbers of Sikhs lead "tranquil and productive lives in other parts of India."
 
 
 66
 BIA opinion (quoting BHRHA Advisory Opinion, ER 553-54).
 
 
 67
 This language, of course, does not pertain to individuals like this applicant who have experienced actual persecution in the Punjab by reason of their suspected political views and associations. The BIA also cited language from the advisory opinion that "India is a democratic nation with strong legal safeguards ...", but failed to note that the document continues:
 
 
 68
 A democratic system, however, does not always prevent problems of violence and abuse of authority. In India, social tensions caused by ethnic, caste, and communal differences and violent secessionist politics generate significant abuse of human rights. Specific problems include security force excesses in Kashmir and separatists terrorism by militants and extrajudicial police actions in Punjab.
 
 
 69
 BHRHA Advisory Opinion, ER 553. The advisory opinion outlines terrorist atrocities and notes that "[s]ecurity forces have unfortunately responded in kind." Id. It acknowledges reports of harassment and other extra-judicial actions by police in the Punjab. Id.
 
 
 70
 Singh demonstrated eligibility for both withholding of deportation and asylum. The district court correctly held that Singh had shown past persecution on account of political opinion. Because the INS introduced no evidence to rebut the presumption of the national government's ability to act on a nationwide basis, there was no need for the district court to order the BIA to conduct further proceedings on the question of conditions in the country of India.
 
 
 71
 The judgment of the district court is affirmed in part and reversed in part and the matter is remanded to the district court for entry of a judgment granting Singh withholding of deportation and directing the BIA to exercise discretion in determining whether Singh should be granted asylum.
 
 
 72
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 The Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Judicial review of BIA deportation and exclusion determinations is governed by 8 U.S.C. Sec. 1105a(a)(4), which provides in relevant part,
 the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive[.]
 
 
 [2]
 The applicant in Matter of R filed a habeas corpus petition and the district court partially reversed the BIA. In an unpublished disposition, we dismissed the appeal on jurisdictional grounds without reaching the merits. Rana v. Moschorak, 37 F.3d 1506 (9th Cir.1994)
 
 
 [3]
 For example, India's Terrorist and Disruptive Activities (Prevention) Act, 1987 ("TADA")
 imposes a minimum of five years' imprisonment for anyone convicted of "terrorist" and "disruptive" activities: the latter are so broadly defined that they encompass any act, including the peaceful expression of views, which questions the sovereignty or territorial integrity of India or which supports any claim for secession. Maximum punishment for such activities is life imprisonment, and execution if the proscribed activities result in death. The five-year mandatory minimum sentence also applies to anyone who "advises or incites or knowingly facilitates" a "terrorist act" or a "disruptive activity" or any act preparatory thereto. The same punishment can be imposed to "whoever harbors or conceals, or attempts to harbor or conceal any disruptionist."
 AMNESTY INTERNATIONAL, INDIA: Human Rights Violations in Punjab: Use and Abuse of the Law, May 1991, AI Index: ASA 20/11/91 ["Punjab Report "], ER 492. TADA article 4(2) defines "disruptive activity" as any action taken:
 (i) which questions, disrupts or is intended to disrupt, whether directly or indirectly, the sovereignty and territorial integrity of India; or
 (ii) which is intended to bring about or supports any claim, whether directly or indirectly, for the cession of any part of India or the secession of any part of India from the Union....
 Id. at n. 16. Amnesty International provides extensive documentation in this record that "people have been imprisoned under the Act for matters entirely unconnected with violent political acts...." Id. The United States Department of State ("DOS") confirms that, "[d]espite the legal safeguards, there were credible reports of widespread arbitrary arrest or detention." Department of State Country Reports on Human Rights Practices for 1990, February 1991 ["DOS Report "], ER 331. TADA "was used mainly in Punjab, Assam, Manipur, Andhra Pradesh, and Jammu and Kashmir.... Despite its name, those detained under the TADA have included peaceful critics of the government in states where there was no armed opposition to the government." AMNESTY INTERNATIONAL, 1991 Country Reports: India ["AI Country Report "], ER 369.