141 F.3d 1175
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Denisa FRANI-CAMARCE, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 96-70185.
INS. No. Ayq-oha-rrs
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 1997.
Decided March 16, 1998.
 
 Petition for Review of an Order of the Board of Immigration Appeals.
 Before PREGERSON, D.W. NELSON, AND HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Petitioner Denisa Frani-Camarce applied for suspension of deportation pursuant to Section 244(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1254(a)(1). The immigration judge ("IJ") denied her application and the Board of Immigration Appeals ("BIA") dismissed her appeal of the IJ's decision. Frani-Camarce now seeks review of the BIA's decision. The BIA dismissed Frani-Camarce's appeal because it found that Frani-Camarce failed to show that her deportation would result in extreme hardship to herself, her two U.S. citizen children, or her parents. We have jurisdiction under Section 106(a)(1), 8 U.S.C. § 1105a(a). We reverse the BIA's decision and remand for further proceedings consistent with this memorandum disposition.
 
 BACKGROUND
 
 3
 Petitioner Denisa Frani-Camarce, a native and citizen of the Philippines, legally entered the United States on December 10, 1987, on a five-year, non-immigrant visa. Petitioner is a single mother supporting two American-born children--a seven-year-old daughter and a six-year-old son. The children's father is a U.S. citizen who provides no financial support or regular care for them. Frani-Camarce's parents, who are lawful permanent residents, live with her and her children in San Diego. Additionally, Frani-Camarce has three sisters who are lawful permanent residents. One sister lives in San Diego with her family; the others live in Chicago.
 
 
 4
 Frani-Camarce, her parents, and her sisters are estranged from the members of their family who live in the Philippines. The record indicates that Frani-Camarce's brother was murdered in the Philippines and that her uncle and his family were linked to the murder. Frani-Camarce contends that these events motivated her parents to emigrate from the Philippines to the United States in 1991. Indeed, the IJ found that Frani-Camarce's entire "significant family is in the United States" and that "she would not be able to turn to [her] family [in the Philippines] for any support if returned to the Philippines."
 
 
 5
 Before coming to the United States, Frani-Camarce worked as a midwife, earning about fifty dollars a month. Once in this country, she acquired additional training and began working as a certified nursing assistant in 1990. Since 1994, she has worked sixteen hours a day at two jobs to support her family: one at a health care center and the other at a convalescent hospital. Because of Frani-Camarce's work schedule, her parents are her children's primary caregivers.
 
 
 6
 Although Frani-Camarce's parents are not financially dependent on her, they are dependent on her in other ways. Frani-Camarce testified that she provides "moral support" to her parents, especially her mother who suffers from skin cancer and requires regular medical treatment. Twice each month, Frani-Camarce drives her mother to the facility where she receives medical treatment and helps her communicate with the medical personnel. Neither parent can read, write or speak English, and neither can drive a car.
 
 
 7
 While in the United States, Frani-Camarce has been an active volunteer in her church. The record reveals that Frani-Camarce has served as the Sunday School Superintendent for her church's children's ministry. According to her pastor, she has been "a valuable asset" to the congregation and her community since 1990.
 
 
 8
 On September 16, 1994, the Immigration and Naturalization Service ("INS") served Frani-Camarce with an Order to Show Cause and Notice of Hearing, which charged that she was excludable under 8 U.S .C. § 1251(a)(1)(A) for procuring entry by fraud and deportable as an overstay under 8 U.S.C. § 1251(a)(1)(B). Frani-Camarce conceded her deportability as an overstay at a hearing held on November 29, 1994. Thus, the INS chose not to pursue its claim that she was excludable for procuring entry by fraud. Without objection from the INS, the IJ granted Frani-Camarce's two requests for extensions to file an application for suspension of deportation. Both the INS and the IJ acknowledged that the extensions would enable Frani-Camarce to accrue the seven years of "continuous physical presence" required to be eligible for suspension of deportation under 8 U.S.C. § 1254(a)(1).
 
 
 9
 Frani-Camarce then filed her application for suspension of deportation on March 6, 1995. After an evidentiary hearing, the IJ issued a decision on April 6, 1995, denying the application for suspension of deportation. Although the IJ determined that she had satisfied the statutory requirements for seven years of continuous physical presence and good moral character, the IJ concluded that Frani-Camarce had failed to show that she, her children, or her parents would suffer extreme hardship were she to be deported.
 
 
 10
 Frani-Camarce appealed to the BIA. On January 31, 1996, the BIA dismissed the appeal based on its independent finding that the emotional and financial hardship that Frani-Camarce's deportation would cause her, her children, and her parents "would not be extreme." The BIA, however, granted Frani-Camarce's request for voluntary departure, coupled with a contingent deportation order in the event of her failure to depart.
 
 
 11
 Frani-Camarce timely petitions for review of the BIA's decision. She contends that the BIA abused its discretion in finding that her deportation would not result in extreme hardship. We agree. The INS argues that even if we determine that the Board abused its discretion in finding that Frani-Camarce's deportation would not result in "extreme hardship," she nonetheless cannot obtain suspension of deportation because her application is now governed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, 110 Stat. 3009 (1996). Specifically, the INS contends that Frani-Camarce cannot satisfy the test for "continuous physical presence" because of the new limitation set out in IIRIRA § 240A(d)(1), which provides that any period of continuous physical presence will end when an alien receives a notice to appear. We disagree. As more fully discussed below, as we read the statute, this new section of IIRIRA is inapplicable to Frani-Camarce's application because she obtained a final administrative decision from the Board before IIRIRA was enacted.
 
 I.
 
 12
 "Where, as here, the BIA conducts an independent review of the IJ's findings, we review the BIA's decision and not that of the IJ." Perez v. INS, 96 F.3d 390, 392 (9th Cir.1996). "The BIA's decision not to suspend deportation is reviewed for abuse of discretion." See id.
 
 II.
 
 13
 The BIA may suspend the deportation of an alien pursuant to Section 244(a)(1) of the INA if an alien meets three requirements: (1) continuous physical presence in the United States for seven years; (2) good moral character; and (3) a showing that deportation would result in "extreme hardship" to the alien, or to her U.S. citizen or permanent resident spouse, children or parents. See 8 U.S.C. § 1254(a)(1). The BIA dismissed Frani-Camarce's appeal on the ground that she failed to prove extreme hardship.
 
 
 14
 "Extreme hardship is hardship that is unusual or beyond that which would normally be expected upon deportation. The common results of deportation ... are insufficient to prove extreme hardship." Perez, 96 F.3d at 392 (internal quotations omitted) (quoting Hassan v. INS, 927 F.2d 465, 468 (9th Cir.1991)). But "[b]ecause hardship depends on [the alien's] specific circumstances, discretion can be properly exercised only if the circumstances are actually considered. When important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary." Santana-Figueroa v. INS, 644 F.2d 1354, 1356 (9th Cir.1981) (citation omitted). Accordingly, in exercising its discretion, the BIA must evaluate the level or degree of individual suffering that an alien and her relevant family members would suffer as a result of deportation.
 
 III.
 
 15
 In the present case, the BIA abused its discretion because it "did not consider all relevant factors before ruling, it did not consider the cumulative effect of the factors it did consider, and it did not provide a reasoned explanation for its conclusions." Watkins, 63 F.3d at 848. Of particular import was the BIA's failure to consider the hardship that Frani-Camarce, her children, and her parents would suffer were they to be separated because of Frani-Camarce's deportation.
 
 
 16
 We have held consistently that "[t]he most important single (hardship) factor may be the separation of the alien from family living in the United States." Contreras-Buenfil v. INS, 712 F.2d 401, 403 (9th Cir.1983) (citation omitted). Indeed, when the BIA fails to give this factor "considerable, if not predominant, weight," it has abused its discretion. Gutierrez-Centeno v. INS, 99 F.3d 1529, 1533 (9th Cir.1996). The BIA should consider the impact deportation will have on all family ties to discharge its discretionary duty properly. See Casem v. INS, 8 F.3d 700, 703 (9th Cir.1993). "The inquiry into family ties ... must not be limited to noting the benefits of living near one's immediate or extended family. The BIA also must examine the impact of 'untying' the family ties Congress sought to safeguard." Id. We find that the BIA failed to properly examine the impact deportation would have on Frani-Camarce, her U.S. citizen children, and her parents.
 
 
 17
 a. Hardship to Frani-Camarce
 
 
 18
 The BIA acknowledged that Frani-Camarce has lived with and cared for her elderly parents since 1991 and that her three sisters also live in the United States. But the BIA failed to consider the emotional and personal impact separation from her parents and sisters would have on Frani-Camarce should she be deported. Cf. Gutierrez-Centeno, 99 F.3d at 1533 (finding abuse of discretion where BIA ignored impact of alien's separation from relatives in the United States, including her brother and aunt who raised her).
 
 
 19
 Moreover, Frani-Camarce testified that her uncle and his family in the Philippines were involved in her brother's murder, and that because of this involvement she and her family in the United States have had no contact with their family in the Philippines. The IJ considered Frani-Camarce's testimony candid and credible and, based on that testimony, found that she could expect no support from her family in the Philippines.
 
 
 20
 The BIA failed to address the possible emotional hardship that Frani-Camarce would face if deported to a country where her only family consists of those linked to her brother's murder. Instead of addressing this problem, the BIA casually stated that Frani-Camarce "may not have optimal family support" in the Philippines as a result of her brother's murder. This is hardly an adequate consideration of the problem.
 
 
 21
 We have recognized that difficulties adjusting to life after deportation can be alleviated when an alien has numerous relatives living in her homeland. See, e.g., Ramirez-Durazo v. INS, 794 F.2d 491, 498 (9th Cir.1986)(finding no extreme hardship where most of an alien's immediate family, including parents and numerous siblings, live in alien's homeland and are "available to assist [the alien] in settling back into the Mexican culture"). For Frani-Camarce, however, deportation would mean that she must sever all close family ties and return to a country in which she has no real familial support. The BIA acted arbitrarily when it disregarded the realities of Frani-Camarce's family ties--both in the United States and in the Philippines. See Watkins, 63 F.3d at 848 (describing denial of relief as arbitrary and an abuse of discretion where BIA "disregards important aspects of the alien's claim") (quoting Saldana v. INS, 762 F.2d 824, 827 (9th Cir.1985)).
 
 
 22
 The BIA further erred by mischaracterizing Frani-Camarce's economic hardship claim. Frani-Camarce argues that deportation will cause her hardship because of the difficulty she will face in obtaining employment in the Philippines. According to the BIA, because Frani-Camarce has not established her complete unemployability, her claim of hardship amounts only to a preference for her "lifestyle here" and for her "career prospects in the United States." The BIA erred by dismissing Frani-Camarce's claim of hardship as a mere lifestyle preference. If deported to the Philippines, Frani-Camarce testified that she would be unable to support her two children as a midwife, the only job in the Philippines for which she is trained. Even in this country, Frani-Camarce must work two jobs, sixteen hours a day to support her two young children.
 
 
 23
 "Although economic detriment alone does not establish extreme hardship, it is nonetheless a factor to be considered in determining eligibility for suspension of deportation." Gutierrez-Centeno, 99 F.3d at 1533 (BIA erred by failing to consider economic hardship that would result from deportation of single mother supporting two children to a country emerging from a civil war and experiencing extremely poor economic conditions). Economic detriment should be considered together with the "non-economic hardships that flow from" it. See Tukhowinich v. INS, 64 F.3d 460, 463-64 (9th Cir.1995) (finding abuse of discretion where BIA failed to consider "implications of [alien's] economic loss," including fact that alien is sole support of her family and has very dim prospects for employment in native country). In this case, the BIA failed to consider the primary hardship that Frani-Camarce would suffer because of her inability to obtain gainful employment in the Philippines: The personal suffering she and her children would endure if she is unable to support and care for her family. In so doing, the BIA abused its discretion.
 
 
 24
 Finally, the BIA erred in failing to consider that Frani-Camarce has provided special assistance to her community. BIA and Ninth Circuit precedent mandate that an alien's position in her community in the United States as well as the special assistance she has given to her community be considered when determining whether to grant suspension of deportation. See Gutierrez-Centeno, 99 F.3d at 1534 (citing In re Anderson, 16 I & N Dec. 596, 597-98 (BIA 1978)). The BIA mentioned that Frani-Camarce has been active in her church and has served as the Sunday school superintendent. But the BIA did not consider that her minister wrote that she has been "a valuable asset to her congregation" and that since 1990 she has been responsible for the congregation's religious education program and for the children who attend the school. See Santana-Figueroa, 644 F.2d at 1357 (finding abuse of discretion where BIA did not consider evidence of alien's service to his community through his church, including priest's statement that alien had been "an asset to our church and community"). The BIA also did not mention or consider Frani-Camarce's work as a nurse's aide at both a health center and a convalescent hospital for which she acquired special training. See Gutierrez-Centeno, 99 F.3d at 1534 (finding that "serious consideration" should be given to alien's service to her community as a nurse's aid).
 
 
 25
 Instead, the BIA dismissed this aspect of Frani-Camarce's claim by stating simply that the record did not show that Frani-Camarce would be "unable to pursue her religious convictions and volunteer activities in the Philippines...." The BIA failed to understand the import of this factor. Frani-Camarce's ability to worship and do volunteer work in the Philippines does not affect the relevance of her service and involvement in her community and her church in the United States. The BIA should have considered the possibility "that extreme hardship would result from the combined effect of depriving [Frani-Camarce] of [her] livelihood and uprooting [her] from a community to which [she] belonged and contributed" for more than seven years. Santana-Figueroa, 644 F.2d at 1357.
 
 
 26
 b. Hardship to Frani-Camarce's Children
 
 
 27
 The BIA also abused its discretion by failing to "consider the specific circumstances of [Frani-Camarce's] citizen children and [by failing to] reach an express and considered conclusion as to the effect of those circumstances upon those children." Delmundo v. INS, 43 F.3d 436, 443 (9th Cir.1994) (quoting Cerrillo-Perez, 809 F.2d at 1426); see also, Jara-Navarrete v. INS, 813 F.2d 1340, 1343 (9th Cir.1986) (finding abuse of discretion when BIA fails to "carefully and individually consider[] the potential hardships" to U.S. citizen children that may arise from the deportation of a parent). A deportable alien "cannot gain a favored status by the [mere] birth of a citizen child." Ramirez-Durazo v. INS, 794 F.2d 491, 498-99 (9th Cir.1986). But when hardship to an alien's citizen children is extreme, it alone may warrant suspension of their parent's deportation. See Cerrillo-Perez, 809 F.2d at 1422.
 
 
 28
 The BIA acknowledged that Frani-Camarce's children live with and are cared for by their grandparents sixteen hours a day. But the BIA failed to consider the emotional hardship that would result when the children are removed from their grandparents' care. The BIA simply stated that "[t]he record does not reveal that the emotional hardship resulting from their separation from their relatives in the United States would be greater than that faced by others who relocate." In reaching this conclusion, the BIA only mentioned the children's phantom relationship with their father. We cannot assume that the BIA considered the children's attachment to their grandparents when the BIA failed to mention this factor in its decision. See Watkins, 63 F.3d at 849.
 
 
 29
 The BIA further abused its discretion by concluding that the children would have no language problems in the Philippines. The BIA reasoned that "although it is reported that the children do not speak Tagalog, they presumably are able to understand [Frani-Camarce's] parents who speak no English and provide care" for them sixteen hours per day. Given the evidence in the record, it is just as likely that Frani-Camarce's parents have learned to speak a minimal amount of English in order to care for their American grandchildren. Thus, the BIA's presumption that the children would not have problems learning Tagalog is not supported by "reasonable, substantial, and probative evidence on the record considered as a whole." Singh v. Ilchert, 63 F.3d 1501, 1506 n. 1 (9th Cir.1995).
 
 
 30
 Finally, the BIA erred in presuming that the children would not have a "significant problem" adjusting to life in the Philippines because they would be preschoolers at the time of their mother's deportation. There is a great difference between the adjustment required of infants as opposed to school-age children who are taken to their parent's homeland. See Casem v. INS, 8 F.3d 700, 703 (9th Cir.1993) (citing Ramos v. INS, 695 F.2d 181, 187 n. 16 (5th Cir.1983). According to the children's birth certificates, Frani-Camarce's children were already of school-age at the time of the BIA's decision in January 1996. Today, the children are six and seven years old and undoubtedly attend school.
 
 
 31
 We have not hesitated to vacate denials of suspension of deportation where the BIA provides conclusory statements about the comparative nature of the hardships American-born children would face as a result of their parent's deportation. See Watkins, 63 F.3d at 849-50; see also Delmundo v. INS, 43 F.3d at 442-43 (finding abuse of discretion where BIA failed to consider "specific circumstances" of citizen child including deportation's impact on close family ties in this country); Jara-Navarrete, 813 F.2d at 1342 (finding abuse of discretion in BIA's cursory and generalized analysis of factors affecting hardship to U.S. citizen children and alien) Cerrillo-Perez, 809 F.2d at 1426 (finding abuse of discretion where BIA failed to state "express and considered conclusions" as to the impact of deportation on children). The BIA abused its discretion because its reasons for finding that Frani-Camarce's American-born children would not face "extreme hardship" rest on generalization and surmise instead of on "individualized consideration" of the children's "individual circumstances." See Jara-Navarrete, 813 F.2d at 1342
 
 
 32
 c. Hardship to Frani-Camarce's Parents
 
 
 33
 The BIA failed to consider all the relevant evidence regarding Frani-Camarce's parents' ties to their daughter and their grandchildren. The record shows that the grandparents have lived with Frani-Camarce and her children since they immigrated to this country in 1991. Frani-Camarce's parents take care of their grandchildren sixteen hours each day. Given this evidence, the BIA should have considered the potential hardship faced by the grandparents in the event of their separation from the grandchildren that they helped raise. Cf. Villena v. INS, 622 F.2d 1352, 1359-60 (9th Cir.1980) (en banc) (finding abuse of discretion where INS failed to consider hardship caused by separation of alien's citizen or permanent resident close family members living together, including alien's children and grandparents). But the BIA's decision contains no mention of this factor.
 
 
 34
 In addition, the BIA minimized the relationship between Frani-Camarce and her parents by suggesting that her deportation would not cause the parents significant hardship because their other adult children "presumably can provide emotional support and occasional assistance with medical appointments as needed." The BIA did not point to the specific evidence in the record indicating the special nature of the relationship between Frani-Camarce and her parents. For example, Frani-Camarce testified that she provides considerable moral support to her mother, who suffers from skin cancer and who is afraid to learn to use the telephone to call a taxi to take her to her bi-monthly doctor's appointments. The fact that Frani-Camarce is a certified nursing assistant provides further aid and comfort to her parents in light of her mother's cancer condition.
 
 
 35
 Nothing in the record indicates that the parents' other children have previously provided, or are capable of providing, similar support. Frani-Camarce has one sister who also lives in San Diego. But when asked whether her parents could live with this sister, Frani-Camarce testified that her sister "has [her] own family," suggesting that her sister either has no room for the parents in her home or is otherwise unable to help them. The other two adult children live in Chicago. The BIA gave no indication that it considered the potential hardship that Frani-Camarce's parents may face if they have to move to Chicago to be closer to their daughters there. A long-distance move would likely be especially difficult in light of the mother's health and her need for regular skin cancer treatment.
 
 
 36
 d. Cumulative Analysis of Hardship
 
 
 37
 In its decision, the BIA stated that it had considered the potential hardship posed by Frani-Camarce's deportation on Frani-Camarce, her children, and her parents, both "individually and cumulatively." However, as counsel for the INS conceded at oral argument, the BIA decision is devoid of any cumulative analysis. The decision instead shows that the BIA evaluated each factor in isolation and that it evaluated the hardship to Frani-Camarce, her children, and her parents individually and successively. The BIA should have considered the cumulative effect of all relevant factors bearing on the hardship to Frani-Camarce, her children, and her parents as individuals, as a family, and in the aggregate. See Watkins, 63 F.3d at 850; see also Cerrillo-Perez, 809 F.2d at 1423 (finding that "[t]he legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." (internal quotations and citation omitted)). The BIA therefore abuses its discretion where, as here, it correctly states its obligation to weigh factors cumulatively but actually fails to do so. See Watkins, 63 F.3d at 850.
 
 
 38
 The import of cumulative analysis cannot be understated. One factor by itself may be a common result of deportation, insufficient in degree or kind to constitute extreme hardship. But that factor, when considered cumulatively with other relevant factors, may constitute hardship that is sufficiently unusual to be "extreme." See, e.g., Prapavat v. INS, 662 F.2d 561, 563 (9th Cir.1981) (finding abuse of discretion where BIA failed to consider cumulative effect of all relevant factors such as existence of U.S. citizen children, minimal economic opportunities for suitable employment in an underdeveloped country, and citizen child's lack of knowledge of the country's language). Thus, the BIA abuses its discretion when it bases its decision to deny suspension of deportation on a cursory analysis of factors viewed in isolation without cumulatively examining the aggregate adverse circumstances suffered by the alien and her relevant family members.
 
 IV.
 
 39
 As pointed out earlier, the INS argues that even if the BIA erred in concluding that Frani-Camarce's deportation would not result in "extreme hardship," her petition for review should still be denied. Specifically, the INS contends that Frani-Camarce is ineligible for suspension of deportation because she cannot establish "continuous physical presence" under the new limitation set forth in IIRIRA § 240A(d)(1). The INS argues that this new limitation applies to Frani-Camarce's application under the "transitional rule" set out in IIRIRA § 309(c)(5). As shown below, this argument fails because the "transitional rule" of § 309(c)(5) does not apply to Frani-Camarce's case.
 
 
 40
 Under the earlier test for continuous physical presence, a petitioner needed to accrue seven years of continuous physical presence in the Unites States before filing an application for suspension of deportation. See 8 U.S.C. § 1254(a)(1). But under IIRIRA's new test, "any period of ... continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear" or an order to show cause why he or she should not be deported. IIRIRA § 240A(d)(1). The INS argues that Frani-Camarce is ineligible for suspension of deportation under this new test because she received her order to show cause before she acquired seven years of continuous physical presence in the United States.
 
 
 41
 However, § 309(c)(1) of IIRIRA explicitly provides that IIRIRA's new rules do not apply to aliens, such as Frani-Camarce, whose exclusion or deportation proceedings began before April 1, 1997. Section 309(c)(2)-(5) lists several exceptions to this general rule. The INS cites the exception found in § 309(c)(5) of IIRIRA in its attempt to apply the new rules to Frani-Camarce. Section 309(c)(5) provides that the new rule for continuous physical presence applies to "notices to appear issued before, on, or after the date of enactment" of IIRIRA. The INS thus argues that § 309(c)(5) applies the new continuous physical presence test to all suspension of deportation cases where the alien received his or her notice to appear or order to show cause before, on, or after enactment of IIRIRA.[1] Thus, the INS contends that the new test applies to Frani-Camarce because she received an order to show cause before IIRIRA was enacted.[2]
 
 
 42
 The INS's broad reading of § 309(c)(5) is not tenable because it conceivably could apply the new rule to suspension of deportation cases that had already received a final administrative decision before IIRIRA's enactment. The INS's reading of § 309(c)(5) is also untenable because it conflicts with the scope of the rest of the exceptions listed in § 309(c). Section 309(c)'s exceptions only permit the application of IIRIRA's new rules to cases that had not yet received a final administrative decision upon IIRIRA's enactment. Thus, the exception in § 309(c)(5) does not apply to Frani-Camarce's application because she obtained a final administrative decision eight months before IIRIRA was enacted.[3]
 
 
 43
 Statutory interpretation always begins with the language of the statute itself. See Astrero v. INS, 104 F.3d 264, 266 (9th Cir.1996). As noted above, § 309(c)(1) of IIRIRA provides that the new rules of IIRIRA do not apply to aliens whose exclusion or deportation proceedings began before IIRIRA's effective date, April 1, 1997. This general rule is subject to various exceptions listed in § 309(c)(2)-(5), each of which permits IIRIRA's new rules to be applied to deportation proceedings in which the alien had not yet received a final administrative decision. For example, § 309(c)(2) permits the Attorney General to apply IIRIRA to cases that began before IIRIRA's effective date of April 1, 1997 only if an evidentiary hearing had not yet commenced as of April 1, 1997. Section 309(c)(3) permits the Attorney General to apply the new rules to cases that began before April 1, 1997 only if there had not yet been a final administrative decision in the case. Section 309(c)(4) provides that the new transitional rules for judicial review only apply to cases that obtained final administrative decisions more than thirty days after the enactment of IIRIRA. Thus, each of these exceptions permit the application of IIRIRA to cases that had not yet culminated in a final administrative decision when IIRIRA was enacted.[4]
 
 
 44
 Section 309(c)(5) provides that "[p]aragraphs (1) and (2) of section 240A(d) of the [INA] ... (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of enactment of this Act [September 30, 1996]." Read in context with the other exceptions listed in § 309(c), § 309(c)(5) permits the application of the new cutoff date in § 240A(d)(1) to cases that had not yet culminated in a final administrative decision when IIRIRA was enacted. Under this reading, applications that had not yet received a final administrative decision upon IIRIRA's enactment are governed by § 240A(d)(1) regardless of when the alien received his or her notice to appear. We decline to give § 309(c)(5) the broad reading suggested by the INS, especially in light of IIRIRA's explicit direction that the new rules should not generally apply to cases that began before April 1, 1997.
 
 
 45
 Thus, § 309(c)(5) does not apply § 240A(d)(1)'s cutoff dates for continuous physical presence to Frani-Camarce's application for suspension of deportation. Instead, Frani-Camarce only need fulfill the requirements of the earlier test for continuous physical presence in effect on January 31, 1996, when the BIA issued its final administrative decision in her case.
 
 CONCLUSION
 
 46
 By failing to consider properly all relevant evidence of extreme hardship, the BIA abused its discretion in dismissing Frani-Camarce's appeal. We therefore grant Frani-Camarce's petition for review of the BIA's dismissal, and remand for further proceedings.
 
 
 47
 REVERSED AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 After oral argument in this case, § 309(c)(5) was amended by the Nicaraguan Adjustment and Central American Relief Act. The Act amended § 309(c)(5) by changing the "notice of appeal" language to "order to show cause." The Act also created an exception to § 309(c)(5) for aliens whose applications are terminated under § 309(c)(3) and for certain aliens granted temporary protection from deportation. See § 309(c)(5)(B)-(C)
 
 
 [2]
 The INS cites two cases in support of its contention: Astrero v. INS, 104 F.3d 264 (9th Cir.1996), and In re N-J-B, Interim Decision 3309, 1997 WL 107593 (BIA Feb. 20, 1997). In Astrero, this court recognized the possibility that § 240A "may apply retroactively to trigger cutoff dates based on notices to appear issued prior to April 1, 1997." Astrero, 104 F.3d at 266 (emphasis added). But in Astrero we did not take a position on the merits of this retroactivity issue, nor did we discuss the scope of any possible retroactivity. Moreover, the BIA's decision in N-J-B was vacated by the Attorney General on July 10, 1997. Nevertheless, we note that the N-J-B decision does not support the INS's position; it clearly contradicts it. In N-J-B, the BIA held that the "transitional rule" of § 309(c)(5) applies only to proceedings pending between September 30, 1996 [IIRIRA's enactment date] and April 1, 1997 (IIRIRA's effective date). See Interim Decision, 3309, 1997 WL 107593, at * 10 (holding that § 309(c)(5) "expressly pertains to suspension of deportation for aliens in proceedings during the transitional period between the date of enactment and the general effective date of April 1, 1997."). Thus, N-J-B does not provide authority for the proposition that § 309(c)(5) applies to aliens such as Frani-Camarce who received final administrative decisions before IIRIRA's enactment
 
 
 [3]
 Frani-Camarce's suspension of deportation proceeding culminated in a final administrative decision on January 31, 1996, when the BIA dismissed her appeal and granted her voluntary departure coupled with a contingent deportation order should she fail to depart. See Foti v. INS, 375 U.S. 217, 219 n. 1, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963) (characterizing BIA's dismissal of appeal and grant of voluntary departure combined with contingent deportation order as final deportation order). IIRIRA was enacted on September 30, 1996, and became effective on April 1, 1997. IIRIRA § 309(a)
 
 
 [4]
 See, e.g., Kalaw v. INS, 133 F.3d 1147, 1150 (9th Cir.1997) ("[A]s to cases in which a final deportation or exclusion order was filed on or before October 30, 1996, the INA as it was codified prior to the passage of IIRIRA applies.... As to cases in which a final deportation or exclusion order was filed after October 30, 1996, and which were pending before April 1, 1997, IIRIRA's transitional rules apply.")