Tarek GHEBLLAWI, Petitioner,

v.

IMMIGRATION & NATURALIZATION SERVICE, Respondent.

No. 92–70483.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1994.

Decided June 6, 1994.

Gerald Robinson, Black Helterline, Portland, OR, for petitioner.

Steward Deutsch, Dept. of Justice, Washington, DC, for respondent.

Before: BROWNING, KOZINSKI and NOONAN, Circuit Judges.

Opinion by Judge NOONAN.

NOONAN, Circuit Judge:

Tarek Ghebllawi petitions this court for review of the decision of the Board of Immigration Appeals (the Board) denying him eligibility for asylum in the United States under 8 U.S.C. § 1101(a)(42). We grant the petition and reverse the decision of the Board.

## FACTS

Tarek Ghebllawi was born in Tripoli, Libya on February 26, 1956. He is of Arab ethnicity and of the Moslem religion. He entered the United States on a student visa in 1980. He is a member of the U.S.A. Chapter of the General Union of the Students of Libya.

Libya is a country ruled by Colonel Muammar Qadhafi, whose rule is supported by some Libyans and strongly opposed by others. Tarek Ghebllawi harbored anti-Qadhafi sentiments and after coming to this country participated in anti-Qadhafi demonstrations in Colorado, Kansas, Oregon, and Washington. In these demonstrations he was hooded, but spoke; he believes that his voice was recognized by pro-Qadhafi Libyans.

In Portland, Oregon, in 1984 Ghebllawi engaged in political argument with the pro-Qadhafi Libyan Students Union. His opponents said to him and his friend: "You will see, you dogs, you will see what will happen to you." Following this encounter the Libyan government asked Ghebllawi to return to Libya, a request he ignored. The Libyan government then reduced Ghebllawi's subsistence allowance in the United States.

At the time of the encounter Ghebllawi was accompanied by his childhood friend and current roommate in Portland, Salem Glali.

Glali was a believer in the violent overthrow of Qadhafi and returned to Libya in 1984 to accomplish this objective; he was intercepted in an attempt to get to Qadhafi's residential camp and was killed. Ghebllawi believes that his close association with Glali would itself endanger him in Libya.

Not long after the death of Glali, representatives of the Libyan government called on Ghebllawi's family in Libya to inquire when he would be returning. One of his brothers advised him not to return to Libya because the government was looking for him. The brother, harassed by the government agents, was instructed by them to persuade Tarek to return.

Eventually the government cut off his scholarship money entirely. As a consequence, Ghebllawi ceased to be a full-time student. The Immigration and Naturalization Service moved to deport him. He applied for asylum.

## PROCEEDINGS

At a hearing held on January 21, 1987 before an immigration judge, Ghebllawi testified to the facts recited above and introduced other evidence. The Immigration and Naturalization Service introduced no evidence, but cross-examined Ghebllawi as did the immigration judge, who suggested that Ghebllawi "sponged off" his friends. At the conclusion of the hearing the judge gave his decision orally, concluding:

My assessment of the Respondent's activities in the United States does not indicate to me that he participated to a degree that would be sufficient to make him a target of interest to the Qaddhafi Government. Indeed, I am not satisfied that the Qaddhafi Government even has information that the Respondent did participate in those activities in the United States. . . . I find that the Respondent has failed to establish a well-founded fear of persecution if he should return to Libya. I find that the Respondent has failed to establish a clear probability that he would be persecuted in Libya. Consequently, I must deny his application for asylum and/or 243(h) relief.

Ghebllawi appealed to the Board, which denied him oral argument and issued an order per curiam affirming the immigration judge's decision "in all respects," although the Board declared that it had reviewed the record in light of *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The Board did "take into account" the State Department's report of human rights conditions in Libya, *Country Reports on Human Rights Practices For 1991* (February 1992) 1495–1501. The Board observed that the report "does discuss continuing human rights abuse in Libya taken against political opponents of the Qadhafi government." The Board, however, considered the practices of the Libyan government not to be relevant because "the record does not reflect that the Libyan government has any reason to be aware of the respondent's activities in this country." The Board also declared that Ghebllawi's fear of persecution based on the killing of his former roommate in Libya was not "reasonable" because his roommate had been engaged in violent opposition while Ghebllawi's opposition was pacific.

Ghebllawi petitions this court for review.

## ANALYSIS

*The Standard of Review.*

█ Prior to changes made in the immigration law in 1980, the standard of review of the Board's finding as to likelihood of persecution was a standard of "extreme deference." *See McMullen v. INS,* 658 F.2d 1312, 1316 (9th Cir.1981). The old statutory language made it a matter of the Attorney General's "opinion" whether the petitioner would be subject to persecution. The extreme deference was rendered to that opinion. *Id.* The statute as amended requires the Attorney General to make a determination of whether the "alien's life or freedom would be threatened." 8 U.S.C. § 1253(h). The law now requires "a factual determination" and, therefore, requires in this court a review of the Board's factual findings in accordance with the normal principles of administrative law. *McMullen,* 658 F.2d at 1316.

Those principles had been authoritatively expounded in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). As Justice Frankfurter put it:

Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Court of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.* at 490, 71 S.Ct. at 466.

This well-known case and the standard it set were invoked only yesterday by a unanimous Supreme Court. *Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992). As the standard has remained unchanged very nearly half a century, we see no reason to treat the Board as a unique kind of administrative agency entitled to extreme deference.

Extreme deference is what a court should show the decision of a prison official running a prison. *Pepperling v. Crist,* 678 F.2d 787, 789 (9th Cir.1982). It is equally the appropriate approach to the internal workings of Congress. *Mester Mfg. Co. v. INS,* 879 F.2d 561, 571 (9th Cir.1989). The Board is neither like a prison official nor like the Congress; in its determinations of eligibility for asylum the Board performs the workaday functions of an administrative agency and its findings are subject to the same kind of judicial scrutiny, respectful and responsible, that we give to the product of any other agency.

*INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992) stated that the Board may be reversed only if the evidence the petitioner presented

"was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution." It is a matter of observation that in current briefing of asylum cases the INS relies on this language and appears to believe that it has a force which somehow casts the balance in the Board's favor.

Acknowledging the vividness of style with which the standard was presented in *Elias–Zacarias,* we do not find that without saying so the Supreme Court intended to change the normal principles of administrative review and put the INS's factual determinations in the same category as those made by a prison official administering a prison. Nothing in the text of *Elias–Zacarias* suggests that such a significant change is being effected. A silent shift in standard is difficult to discern. Accordingly, we continue to apply the usual rule.

*The Standard or Standards Applied by the Board.*

█ One standard governs the withholding of deportation; a more generous standard governs the determination of eligibility for asylum. 8 U.S.C. § 1253(h); 8 U.S.C. § 1101(a)(42)(A). The immigration judge did not distinguish the two standards. The Board affirmed the immigration judge's decision "in all respects." It is true that the Board, unlike the immigration judge, made reference to *Cardoza–Fonseca,* the leading opinion of the Supreme Court on the standard in asylum cases. At the same time the Board made no attempt to sort out the two different standards. The law requires the Board to be explicit as to which standard it is applying. *Arteaga v. INS,* 836 F.2d 1227, 1229 (9th Cir.1988); *Rodriguez v. INS,* 841 F.2d 865, 869–70 (9th Cir.1987). On this ground it is necessary to remand to the Board.

**PETITION GRANTED; DECISION REVERSED and REMANDED for proceedings consistent with this opinion.**