82 F.3d 423
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Alejandro SALMERON-MARTINEZ; Maritza Pineda-Laguna;
Willmer Dolores Salmeron-Pineda, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-70624.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 16, 1996.
Decided April 8, 1996.
 
 Before: REINHARDT, THOMPSON, and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Alejandro Dolores Salmeron-Martinez, his wife Maritza Pineda-Laguna, and their minor son Willmer Dolores Salmeron-Pineda, all natives and citizens of Nicaragua, petition this court for review of a final order of the Board of Immigration Appeals ("BIA" or "Board") which dismissed their appeal from the order of an immigration judge which denied their request for asylum and withholding of deportation.[1] Because the Board's finding that the petitioners do not have a well-founded fear of persecution is supported by "substantial evidence" as that term was defined in INS v. Elias-Zacarias, 502 U.S. 478 (1992), we deny the petition for review.[2]
 
 
 3
 * We emphasize at the outset that, for a number of reasons, the issue before the court is quite narrow. First, while the BIA found that the petitioners had failed to satisfy the eligibility standards for either asylum or withholding of deportation, the petitioners challenge only the BIA's asylum finding; we therefore need not address the issue of withholding of deportation.[3]
 
 
 4
 Second, in order to qualify as refugees (and to thus be eligible for asylum), the petitioners "must show either past persecution or a 'well-founded fear of persecution' on account of race, religion, nationality, membership in a particular social group, or political opinion." Singh v. Ilchert, 69 F.3d 375, 378 (9th Cir.1995). The BIA found that the petitioners had failed to prove either past persecution or a well-founded fear of future persecution. However, petitioners' opening brief does not challenge the BIA's past persecution finding; we therefore address only whether petitioners have a well-founded fear of persecution.[4]
 
 
 5
 Third, the test for well-founded fear of persecution includes both subjective and objective components. Id. (citation omitted). However, during oral argument respondents conceded that petitioners' fears are subjectively genuine; we are thus only concerned with whether their fear of persecution is objectively "well-founded."[5]
 
 
 6
 The scope of our review of the BIA's finding on this issue is similarly limited. This court must uphold the BIA's finding "if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " Ubau-Marenco v. INS, 67 F.3d 750, 754 (9th Cir.1995) (quoting Elias-Zacarias, 502 U.S. at 481 (citation omitted)). As the Supreme Court has explained, in order to obtain a reversal on this issue the petitioners must present evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 483-84. "To reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it...." Id., 502 U.S. at 481 n. 1 (emphasis in original). In light of Elias-Zacarias, "our substantial evidence review of the Board's findings that [the petitioners have] failed to establish a well-founded fear of persecution is extremely deferential." Ghaly v. INS, 58 F.3d 1425, 1431 (9th Cir.1995) (emphasis added).
 
 
 7
 Petitioners argue that Ghebllawi v. INS, 28 F.3d 83 (9th Cir.1994) mandates that we apply a more deferential standard of review than that outlined in Elias-Zacarias. We disagree. As this court explained in Prasad v. INS, 47 F.3d 336, 339 (9th Cir.1995), "[t]he Supreme Court's opinion in Elias-Zacarias is the definitive statement of 'substantial evidence' in the context of the standard of review of factual determinations in asylum cases." See also Ghaly, 58 F.3d at 1431.
 
 
 8
 We also reject petitioners' argument that the question of whether they have established a well-founded fear of persecution is a "purely legal" one which should be reviewed de novo. As this court has noted,
 
 
 9
 the Supreme Court held [in Elias-Zacarias ] that whether the applicant in a particular case had sustained its burden by sufficient evidence involves issues of fact. The Court said that the applicant in that case could obtain judicial reversal of a BIA adverse asylum eligibility determination only by showing that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."
 
 
 10
 Singh v. Ilchert, 63 F.3d 1501, 1507 (9th Cir.1995) (citation omitted) (emphasis added).
 
 
 11
 While Singh explained that de novo review may be appropriate in cases "involv[ing] interpretation of the applicable statute and regulations," id. at 1508, or cases "review[ing] questions of law regarding the [Immigration and Nationality Act]," id. at 1506, this is not such a case. As petitioners themselves point out, "[t]he sole issue presented by this case ... is whether the persecution feared by the petitioners was 'well-founded,' " or, in other words, whether petitioners have established that they are "eligible for asylum." Elias-Zacarias, 502 U.S. at 481. This is precisely the type of decision which the Supreme Court held "can be reversed only if the evidence presented ... was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Id. (citation omitted). Accordingly, we decline petitioners' invitation to apply a less deferential standard of review.[6]
 
 II
 
 12
 * Turning to the merits of petitioner Salmeron-Martinez's claim, we conclude that the BIA's finding that he has failed to establish a well-founded fear of persecution is supported by substantial evidence.
 
 
 13
 In 1978, angered by a pro-Sandinista demonstration against his uncle which was taking place outside his uncle's home, petitioner drove a truck through and disrupted the demonstration. He alleges that thereafter the Sandinistas watched him "with evil eyes and took note of [his] every move."
 
 
 14
 In 1981, petitioner was detained by the Sandinistas for one week. Petitioner alleges that the detention occurred because of his actions in the 1978 demonstration some three years earlier, and because of his refusal to participate in local Sandinista Defense Committee ("C.D.S.") activities. The Sandinistas did not harm or threaten petitioner during the detention, and he did not have to agree to join the C.D.S. in order to be released.
 
 
 15
 Later in 1981, petitioner and his driver were shot while driving a car through a "military zone." At the time of the attack, petitioner was employed by the government and was in a government vehicle. Petitioner testified that he never saw his attackers, who fired from mountains located some 100 meters away.
 
 
 16
 Believing that the ambush was a Sandinista attempt to assassinate him for his actions in 1978 and for his refusal to participate in C.D.S. activities, petitioner filed a complaint charging the Sandinistas with the attack. Petitioner alleges that the Sandinistas "interviewed" him regarding his allegations on three occasions, and that they denied involvement in the shooting. He also alleges that in the following months he was "repeatedly harassed" by members of the C.D.S. who wanted to recruit him.
 
 
 17
 In 1983, some two years after the ambush, petitioner applied for and received an exit visa to leave Nicaragua. He entered the United States illegally in August 1983.
 
 
 18
 In concluding that Salmeron-Martinez failed to establish a well-founded fear of persecution, the BIA relied on a number of factors. First, the Board noted that although petitioner was detained for a period of one week, he was neither harmed nor threatened either during or after the detention. Second, the BIA noted that petitioner's conclusion that he was deliberately attacked by the Sandinistas was "nothing more than mere speculation." The BIA noted that he was unable to identify his attackers; more importantly, it found that his theory that the Sandinistas chose this opportunity to kill him for his actions three years earlier (and for his refusal to participate in C.D.S. activities) was without reasonable basis, particularly in light of the fact that the Sandinistas had an opportunity to harm him during his earlier detention and did not do so.
 
 
 19
 Third, the BIA rejected petitioner's argument that he had a well-founded fear of persecution stemming from his accusation that the Sandinistas had shot him. The BIA noted that in the two years between the time he accused the Sandinistas of the shooting and the time he left Nicaragua, he was neither harmed nor threatened. Fourth and finally, the BIA noted that the Sandinistas had granted him an exit visa and allowed him to leave Nicaragua.
 
 
 20
 It is worth noting that the BIA did not rely exclusively on any one of these factors. Instead, the Board looked at the totality of petitioner's circumstances and concluded that
 
 
 21
 where the respondent had previously been detained but released unharmed, and following his accusations there existed both no suggestion of a threat and no indication whatsoever of attempts to take action against him over a period of almost 2 years, and the Sandinistas were aware of and agreed to his departure, we find that these circumstances in total do not establish a well-founded fear of persecution by the Sandinistas.
 
 
 22
 (Emphasis added).
 
 
 23
 Petitioner makes three arguments in support of his contention that the BIA erred. First, he maintains that the BIA erroneously concluded that because he was not harmed during his one-week detention, his detention was "not relevant" to a well-founded fear of persecution. However, the BIA did not dismiss his detention as irrelevant; to the contrary, the Board simply found that his detention was insufficient to substantiate his fears of future persecution. In doing so, the Board appropriately relied on petitioner's own testimony that he was released unharmed and was not subsequently detained, harmed, nor threatened. See, e.g., Mendez-Efrain v. INS, 813 F.2d 279, 283 (9th Cir.1987) (fact that alien was released unharmed and was "not tortured, beaten, molested, harmed, or even threatened" during or after brief detention by Salvadoran military officials supported Board's finding that his fears of persecution were not well-founded).
 
 
 24
 Second, petitioner raises the related argument that the BIA erred legally and factually when it concluded that no action was taken against him in the two years following the shooting. He argues that the BIA ignored his testimony that he was "harassed" while recuperating at home by C.D.S. members who, as part of a "recruitment drive," "attempted to coerce [him] to participate in" the C.D.S. However, petitioner offered no evidence of any "coercion."[7] In addition, he testified he told the Sandinistas that he would not take part in the C.D.S. because he had an injured arm and because he "had to help take care of [his] father's farm," and that after he did so "several months passed," apparently without incident. Moreover, as noted above, the BIA properly relied on the fact that he was not harmed, detained, nor even threatened in the two years he lived in Nicaragua following his accusations. See Castillo v. INS, 951 F.2d 1117, 1122 (9th Cir.1991) ("When determining the objective reasonableness of an alien's claim of well-founded fear of persecution the BIA may properly consider as significant a petitioner's safe and undisturbed residence in his homeland after the occurrence of the event which is alleged to have induced his fear.").[8]
 
 
 25
 Third, petitioner contends that the BIA erroneously relied on the fact that he was able to obtain an exit visa. However, this court has repeatedly held that the ability to obtain such a visa is a factor which the BIA may take into account when determining whether a petitioner is eligible for asylum. See, e.g., Estrada-Posadas v. U.S. INS, 924 F.2d 916, 920 (9th Cir.1991); Rodriguez-Rivera v. U.S. Dept. of Immigration and Naturalization, 848 F.2d 998, 1006 (9th Cir.1988).
 
 
 26
 In sum, the BIA's conclusion that Salmeron-Martinez failed to establish a well-founded fear of persecution is supported by substantial evidence, and he has failed to present evidence strong enough to compel the conclusion that the BIA erred. See Elias-Zacarias, 502 U.S. at 481 n. 1.
 
 B
 
 27
 We also conclude that the BIA's finding that petitioner Pineda-Laguna has failed to establish a well-founded fear of persecution is supported by substantial evidence.
 
 
 28
 Pineda-Laguna testified that her problems with the Sandinistas began in 1983, when the Sandinista Army illegally conscripted her underage brother. She and other family members attempted unsuccessfully to secure his release by showing his birth certificate to army officials. Tragically, in June 1983 her brother was shot and killed. Ms. Pineda-Laguna received information which led her to conclude that the Sandinistas killed her brother because he had attempted to desert the army.
 
 
 29
 Following her brother's murder, petitioner stopped attending meetings of the C.D.S. In addition, she testified that the Sandinistas harassed her on her way to her teaching job, and that they subjected her to surveillance in the classroom. Because of the surveillance, she ultimately decided to quit her job.
 
 
 30
 In March 1985, petitioner came upon a pro-Sandinista demonstration sponsored by the "Mothers of Martyrs and Heroes," a group made up of women who had lost children to the Contras. To her apparent horror, she discovered her mother participating in the demonstration. She grabbed the Sandinista flag her mother was carrying, threw it to the ground and trampled on it, and accused her mother of desecrating her brother's memory. The leader of the demonstration then intervened, and accused petitioner of being a Contra "just like [her] husband."
 
 
 31
 Following this incident, petitioner attempted to leave Nicaragua. While she initially had difficulty obtaining an exit visa, her mother was able to obtain one for her. Petitioner left Nicaragua some six weeks after the rally. She testified that her sister has told her that she is still remembered and "talked about" by those who supported the Sandinistas.
 
 
 32
 The BIA's finding that Pineda-Laguna had failed to demonstrate a well-founded fear of persecution was based primarily on two factors. First, the BIA found that, contrary to her contention, petitioner was not forced by the Sandinistas to leave her job, but had quit voluntarily. Second, the BIA noted that although she had been accused of being a Contra following the 1985 rally, she was neither threatened nor harmed after the incident. The BIA thus concluded that she had not suffered past persecution, and that her fears of future persecution were not well-founded.
 
 
 33
 Pineda-Laguna's primary argument is that the BIA mischaracterized the basis of her asylum claim. She states that the BIA improperly focused only on the disruption of the 1985 rally, and ignored the fact that she had a "long history of conflict" with the Sandinistas. In particular, she points out that even before the 1985 incident, her husband had been imprisoned and shot; her brother had been murdered; she had stopped attending meetings of the C.D.S.; she had been harassed on the way to work; and she had been subjected to surveillance in the classroom. She also points out that after the 1985 rally, she had difficulty obtaining an exit visa. In light of these facts, she alleges that the BIA erred by focusing only on the rally.
 
 
 34
 For a number of reasons, we disagree. First, petitioner's reliance on her family's experiences does not lead us to conclude that the BIA erred. It is true that this court has held that an alien may prove a well-founded fear of persecution based on a close association with family members who were themselves persecuted. Arriaga-Barrientos v. U.S. INS, 937 F.2d 411, 414 (9th Cir.1991) (citation omitted). In such cases, however, the court has "required ... that this violence create a pattern of persecution closely tied to the petitioner." Id. (citation omitted). "Allegations of isolated violence are not enough." Id. (citation omitted).
 
 
 35
 In light of this court's decision to uphold the BIA's finding that petitioner's husband failed to establish a well-founded fear of persecution, Pineda-Laguna's claim that she is likely to be a target of future persecution because of her association with her husband is unavailing. In addition, while Pineda-Laguna's brother's murder was outrageous and tragic, there is no evidence that he was killed because of his political views; to the contrary, he was apparently shot while trying to desert the army which had illegally conscripted him. Because there is no evidence that her brother was "persecuted,"[9] petitioner's argument that she is a likely target of persecution because of her association with her brother is unpersuasive. In sum, petitioner has failed to establish "a pattern of persecution closely tied" to her. Id.
 
 
 36
 In addition, in spite of petitioner's personal experiences, she admitted that she was never physically harmed or abused, arrested, imprisoned, or even threatened at any time while she was in Nicaragua, either before or after the 1985 rally. In addition, she admitted that she suffered no adverse consequences from withdrawing from the C.D.S.[10]
 
 
 37
 In sum, the BIA's conclusion that Pineda-Laguna failed to establish a well-founded fear of persecution is supported by substantial evidence, and Pineda-Laguna has failed to present evidence strong enough to compel the conclusion that the BIA erred. See Elias-Zacarias, 502 U.S. at 481 n. 1.
 
 III
 
 38
 For these reasons, we deny the petition for review.
 
 
 39
 PETITION DENIED.
 
 
 40
 REINHARDT, Circuit Judge, concurring in part, dissenting in part:
 
 
 41
 While I agree with the majority that the BIA's conclusion that Salmeron-Martinez failed to establish a well-founded fear of persecution is supported by substantial evidence, I believe that the BIA's conclusion that Pineda-Laguna failed to establish such a fear is based on legal error. Accordingly, I would remand to the BIA for a determination as to whether Pineda-Laguna established a well-founded fear of persecution.
 
 
 42
 I begin with the fact that the BIA not only relied on an unsupported factor in reaching its decision regarding Pineda-Laguna, but it also improperly failed to consider a significant factor that was present. First, that Pineda-Laguna suffered no harm in the six weeks preceding her departure does not constitute proper evidence that she did not have a well-founded fear. Although the BIA may properly consider a petitioner's undisturbed residence in his homeland following the event that is alleged to have induced the fear of persecution, see Castillo v. INS, 951 F.2d 1117, 1122 (9th Cir.1991), the facts in the cases in which we have found this factor appropriate are readily distinguishable from the facts in this case. See id. at 1122 (concluding that five-year undisturbed residence constituted substantial evidence); Rodriguez-Rivera v. INS, 848 F.2d 998, 1006 (9th Cir.1988) (finding that two-month undisturbed residence, when coupled with fact that guerilla who made initial threat was dead, constituted substantial evidence). The six-week period free from harm enjoyed by Pineda-Laguna is of no legal significance whatsoever.
 
 
 43
 Second, while the BIA invariably relies on a petitioner's ability to obtain exit documents in considering a claim of asylum, the record here reveals that the BIA appears to have accorded no weight to Pineda-Laguna's difficulties in obtaining such documents. If the ease with which Salmeron-Martinez obtained his exit visa undermines his request for asylum, Pineda-Laguna's difficulties in obtaining her exit visa must lend some support to her request for asylum. Indeed, that she was only able to obtain an exit visa with the assistance of her mother, who had connections in the CDS, constitutes probative evidence of her contention that she had fallen into disfavor with the CDS and that she reasonably feared reprisals as an opponent of the Sandinista government.
 
 
 44
 Even more important than these errors, the BIA erred in assessing Pineda-Laguna's request for asylum by uprooting the disruption of the demonstration from its context, considering it in isolation, and thereby ignoring the substance of her claim. The BIA first dismissed the relevance of her brother's death and her difficulties at work by concluding that she was not forced to leave her job. However, it did not dispute that she was subjected to monitoring and harassment for her political opinion. It then failed to consider the relevance of her husband's experience in determining the reasonableness of her fear. Although her husband may not have qualified as a refugee, his actions--in accusing the Sandinista government of having ambushed him and in fleeing the country--have an undeniable relevance to Pineda-Laguna's claim, specifically to the objective reasonableness of her fear of persecution.
 
 
 45
 The BIA's mischaracterization of Pineda-Laguna's claim was critical to the outcome of her case. Having reduced her claim to a single, isolated incident, the BIA considered what action, if any, a person who had disrupted a pro-Sandinista demonstration or shown disrespect for the government could reasonably expect the Sandinistas to take. This, however, is the wrong inquiry. The BIA failed to consider, as it should have, whether a reasonable person in the political, social and cultural milieu of Nicaragua, in 1985, would have, under all of the circumstances applicable to Pineda-Laguna, feared persecution. See Montecino v. INS, 915 F.2d 518, 520-21 (9th Cir.1990) ("Reasonableness refers to the reasonable apprehensions and reactions of a particular applicant with a particular set of political, social and cultural determinants.").
 
 
 46
 Specifically, the BIA ignored the relation of three important circumstances that were relevant to a determination whether Pineda-Laguna's fear of persecution was well-founded. First, Pineda-Laguna engaged in a flagrant, public show of anti-Sandinista sentiment, which was witnessed by persons with influence with the local CDS, and as a result she was publicly accused of being a Contra, like her husband. Second, she had already come under suspicion and been subjected to harassment and monitoring of her political opinion following the murder of her brother, who had attempted to desert from the Sandinista army. Third, her husband, who had accused the Sandinistas of having attempted to kill him, had fled the country fearing that he had been marked as a Contra. These factors must be considered collectively in determining whether Pineda-Laguna reasonably could reasonably have feared persecution. See In re Mogharrabi, I & N Dec. 439, 448 (BIA 1987) (concluding that a reasonable person, who had made his opposition to Khomeini government known to consular official, would fear that his opposition had "become known to those who are both in a position, and who have the inclination, to punish him for it").
 
 
 47
 Because the BIA erred in its characterization of Pineda-Laguna's claim of asylum and failed to take the relevant circumstances into account, we cannot determine whether its decision is supported by substantial evidence. Because of this and the other errors the BIA made in Pineda-Laguna's proceedings, I would remand her petition in order to permit the BIA to determine her eligibility for asylum in accordance with the applicable legal principles and in light of all the appropriate circumstances. In my opinion, the BIA has not yet considered whether a reasonable person in Pineda-Laguna's circumstances would have been justified in fearing political persecution. That is a task I believe it must undertake before it decides that she ineligible for a grant of asylum.
 
 
 48
 I would deny the petition as to Salmeron-Martinez and remand as to Pineda-Laguna.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Salmeron-Martinez and Pineda-Laguna have independent claims to asylum; their son's claim is derivative of their claims. See 8 C.F.R. § 208.21
 
 
 [2]
 We have jurisdiction to consider the petition under 8 U.S.C. § 1105a(a)
 
 
 [3]
 Petitioners have thus waived any challenge to the BIA's finding regarding withholding of deportation. See, e.g., Collins v. City of San Diego, 841 F.2d 337, 339 (9th Cir.1988)
 
 
 [4]
 At oral argument, petitioners' counsel stated that while Pineda-Laguna's claim for asylum is based solely on a well-founded fear of persecution, Salmeron-Martinez's claim is based on both past persecution and a well-founded fear of persecution. However, petitioners failed to challenge the BIA's findings on past persecution in their opening brief, and argued instead that "[t]he sole issue presented by this case ... is whether the persecution feared by the petitioners was 'well-founded.' " Petitioners have thus waived any argument that they are eligible for asylum because of past persecution. Collins, 841 F.2d at 339
 
 
 [5]
 The objective element requires a showing "by credible, direct, and specific evidence in the record ... that persecution is a reasonable possibility." Singh, 69 F.3d at 378 (citations, quotations omitted)
 
 
 [6]
 The BIA reviewed the immigration judge's decision de novo; accordingly, our review is limited to the BIA's opinion. Acewicz v. U.S. INS, 984 F.2d 1056, 1059 (9th Cir.1993)
 
 
 [7]
 In support of his argument that he was "coerced," petitioner states only that the Sandinistas "went so far as to offer him an economic incentive: they encouraged him to take a job as a military chauffeur." The fact that he was provided an "economic incentive" to join the C.D.S. does not, however, rise to the level of "suffering or harm" necessary to establish persecution. See, e.g., Ubau-Marenco v. INS, 67 F.3d 750, 754 (9th Cir.1995) (defining persecution as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive") (quotations, citations omitted)
 
 
 [8]
 Because petitioner alleges that he was occasionally visited by Sandinistas attempting to recruit him as part of a "recruitment drive," this case is somewhat factually distinguishable from Castillo in that petitioner's residence in Nicaragua was not entirely "undisturbed." However, the court in Castillo relied heavily on the fact that the petitioner remained "safe," and was never "restricted" or "harmed." Accordingly, Castillo supports the conclusion that the BIA's finding here was supported by substantial evidence
 
 
 [9]
 See Alonzo v. U.S. INS, 915 F.2d 546, 548 (9th Cir.1990) (forced conscription is not political persecution on account of political or religious beliefs unless the "government knew of [the alien's] political or religious beliefs and attempted to conscript him despite those beliefs")
 
 
 [10]
 The dissent argues that the fact "that Pineda-Laguna suffered no harm in the six weeks preceding her departure does not constitute proper evidence that she did not have a well-founded fear." Post, at 1 (emphasis in original). Nevertheless, the dissent concedes that in Rodriguez-Rivera, 848 F.2d 998, 1006 (9th Cir.1988), this court held that a "two-month undisturbed residence, when coupled with the fact that the guerilla who made the initial threat was dead, constituted substantial evidence." Post at 1 (emphasis in original). The dissent's emphasis on the fact that the guerilla was dead makes it necessary to point out that the guerilla's death was important only because it meant that the person who had explicitly threatened to kill the petitioner was no longer on the scene, and the petitioner was thus not in danger during those two months. In this case, Pineda-Laguna admits that no one ever physically threatened her, either before or after the rally; as such, there is no indication that she was ever in physical danger. Rodriguez-Rivera thus supports our conclusion that the BIA properly relied on Pineda-Laguna's undisturbed six-week residence